Gregory B. Smith (USB 6657)
GREG SMITH & ASSOCIATES
7324 South Union Park Avenue
Midvale, UT 84047
(801) 641-3397
gs@justiceinutahnow.com

*Attorney for Plaintiff, David Baker*

---

# IN THE UNITED STATES DISTRICT COURT
## STATE OF UTAH

---

| | |
|---|---|
| DAVID BAKER,<br><br>    Plaintiff,<br><br>*vs.*<br><br>TOTAL HOME SERVICES OF UTAH, a Utah Corporation, ROGER and RHONDA HUGHES, Utah individuals.<br><br>    Defendants. | **COMPLAINT FOR LEGAL AND EQUITABLE RELIEF (JURY TRIAL DEMANDED)**<br><br>Case No.<br>Judge |

---

Plaintiff, DAVID BAKER, by and through above-signed counsel, hereby complains against

Defendants, TOTAL HOME SERVICES OF UTAH (THSU) and ROGER and RHONDA

HUGHES, demanding a trial by jury, and seeking relief as follows:

## I. PARTIES

1. Plaintiff, David Baker, is a Utah citizen who resides in Tooele County, State of Utah.

2. Defendant, THSU, is Utah entity number: 9073551-0142; Company

  Type: Corporation - Domestic – Profit; Address: 854 WEST 450 NORTH STE. 10

  KAYSVILLE, UT 84037; Registered Agent: Joshua Irvine; Registered Agent

  Address: 2650 WASHINGTON BLVD SUITE 103 , OGDEN, UT 84401

3. Defendants, Roger and Rhonda Hughes are individuals, who resides in Davis

County, Utah.

## II.    JURISDICTION AND VENUE

4.  The Court has jurisdiction under the United States Fair Labor Standards Act of 1938, §§ 7, 15(a)(3), 29 U.S.C.A. §§ 207, 215(a)(3); 29 C.F.R. § 778.111. The Court also has supplemental jurisdiction pursuant to 28 U.S. Code § 1367 over Plaintiff's state contract claims.

5.  Venue is proper in this Court (pursuant to 28 U.S.C. § 1391) because the activities took place in the State of Utah.

## III.    STATEMENT OF FACTS/CLAIM

6.  At all times while Plaintiff worked for Defendants, Defendants were his employers, and THSU was a covered enterprise for purposes of the United States Fair Labor Standards Act (FLSA).

7.  All that facts listed herein apply to all Defendants jointly and severally.

8.  Plaintiff went to work for Defendants on or about February of 2017.

9.  Defendants knowingly mislabeled him as an independent contractor. See Appendix

10. He was separated from Defendants' employ on or about mid-August of 2021.

11. While working for Defendants, Mr. Baker was economically dependent on the business of Defendants to which he rendered service.

12. Defendants had a very high degree of control of him.

    a.  They set his schedule.

    b.  He could not change his schedule.

    c.  They set his rate of pay (and at their sole discretion determine chargebacks and refunds), which was a combination of hourly and flat rate.

    d.  They had him attend their meetings (especially every Monday and Wednesday).

    e.  He had to do things Defendants' say.

    f.  He picked up parts from Defendants.

    g.  He wore Defendants uniform.

    h.  He had Defendants' signage on "his" van.

13. Plaintiff had no real opportunity for profit or loss—he did a job, and was paid for that job at their rate.

14. He was told he had to make his own van payment, and pay for his gasoline and insurance, but such was not an investment; rather, employer expenses that Defendants had Plaintiff paying.

15. Plaintiff worked for Defendants for many years, and worked for them only.

16. The degree of skill required for him to perform his work did not require a degree, nor any special, high-level training, just general appliance repair and some refridgeration.

17. The work he did (repairing appliances and handy-man  work) was an integral part of Defendants' business.

18. For at least the past four years, Defendants either knew, or should have known that they were violating the law by labeling Plaintiff as an independent contractor because all the factors just given pointed to the fact that Plaintiff was their employee, not an independent contractor.

19. Plaintiff worked many overtime hours for which he has not been paid.

20. Plaintiff worked over forty hours (week after week), and worked many hours off the clock.

    a.  He was not typically paid for drive time.

    b.  He was not typically paid for "call ins."

21. Plaintiff complained that he was not being paid properly, but Defendants would tell him either was taking too much time off, or that the problem was all due to him.

22. They then retaliated against him by shifting the better jobs he was given to others, and his pay decreased after he complained.

23. On various jobs, Defendants paid Plaintiff less than his contractual rates.

## IV. CAUSES OF ACTION

24. Any cause of action supported by the facts, either now known or unknown; breach of contract in various jobs he performed; violations of the FLSA (not properly paying overtime, and having illegally retaliated against Mr. Baker).

## V. PRAYER FOR RELIEF

25. Mr. Baker prays for all unpaid wages that he is owed by Defendants, the appropriate liquidated damages owed under the FLSA, plus all of his attorney's fees and costs that relate to this case.  Discovery will be needed to get the exact of monies owed, but it is anticipated that those numbers may around $80,000 or so.


DATED this 16th day of 2021.

/s/ Gregory B. Smith

Gregory B. Smith, attorney for Plaintiff

# APPENDIX

## 5. INDEPENDENT CONTRACTOR STATUS

Contractor is an independent contractor and not an employee or agent of Company. Contractor represents that Contractor has all business permits, certificates, and licenses necessary to perform the Services. Company will not dictate the manner or means by which Contractor performs the Services, which will be in Contractor's discretion. Contractor is not authorized to act on behalf of Company and will not represent to any third party that Contractor is authorized to act on behalf of Company.

**Not an Employee:** Contractor understands that this Agreement does not constitute a contract of employment or obligate Company to employ contractor or any of contractor's employees at all or for any stated period of time. Contractor will not be eligible for any employee benefits (except any that, by law, must be made available to independent contractors), nor will Company make deductions from payments made to Contractor for taxes, all of which will be Contractor's responsibility.

Contractor must report as income all compensation received by Company under this Agreement, and Contractor will pay all self-employment and other taxes. Contractor will indemnify Company and hold it harmless to the extent of any obligation imposed on Company (i) to pay in withholding taxes or similar items or (ii) resulting from Contractor's being determined not to be an independent contractor.

**Non-Exclusive Arrangement:** This is a non-exclusive arrangement so that Contractor may provide services to other companies during the term of the Agreement. However, Contractor agrees that during the term of this Agreement, Contractor will not engage in any competing business of Company and Contractor will not assist any other person or organization in competing with Company or in preparing to engage in competition with the business or proposed business of Company about which Company has advised Contractor. Contractor further agrees not to engage in providing services within the same service are utilized by Company.

## 6. CONFIDENTIAL INFORMATION

In the course of providing the Services, Contractor may have access to trade secrets, business practices, strategies, customer lists, supplier lists, inventions, innovations, processes, information, records and specifications that are owned by or proprietary to Company (collectively, "Confidential Information")

Contractor will not reproduce any Confidential Information without Company's prior written consent, will not use any Confidential Information except in the performance of the Services during the term of this Agreement, and will not disclose any Confidential Information in any form to any third party, either during or after the term of this Agreement without Company's prior written consent.

On the expiration or termination of the Agreement, Contractor will promptly return to Company all copies and derivatives of any Confidential Information, whether in Contractor's possession or under Contractor's direct or indirect control. **If contractor hires or associates with any third person for the performance of the Services, Contractor will obtain the written agreement of that person to be bound by the provisions of this Agreement, including this duty of confidentiality.**

# Independent Contractor Agreement

This Independent Contractor Agreement ("Agreement") is entered into by and between Total Home Services of Utah, DBA Total Appliance Service, Inc. ("Company") and, ("Contractor") as of the date indicated below.

## 1. DUTEIS

During the term of this Agreement, Contractor will perform services ("Services") for Company as described in Exhibit A, which is incorporated into this Agreement by reference. Contractor will use Contractor's best efforts to perform the Services in a manner satisfactory to Company and will devote the amount of time reasonably necessary to perform the Services. Contractor will make all revisions to the work product the Company reasonably requires. Contractor will provide status report and any other information or documentation upon request.

## 2. COMPENSATION

As consideration for this Agreement, Company will pay compensation to Contractor in the amounts and at the times described in Exhibit A.

## 3. EXPENSES

Contractor will be responsible for all incidental expenses incurred in connection with the Services.

## 4. TERM AND TERMINATION

The term of this Agreement will commence on its execution by both Contractor and Company and will expire on the termination date indicated in Exhibit A, or on the completion of the Services, whichever is sooner. Either party may terminate this Agreement at any time on 30 days' written notice. If Contractor is convicted of a crime, commits serious misconduct in connection with the Services, or materially breaches this Agreement, Company may terminate this Agreement immediately and without prior notice to Contractor.

In the event of early termination, Company will pay Contractor for Services rendered to the date of termination as provided in Exhibit A. If no method of calculating compensation in the event of early termination is provided in Exhibit A, then the compensation due on the early termination is will be based on the ration of the amount of work performed since the last event triggering a payment obligation (or if none, since the beginning of the term of the contract) to the total amount of work that would have been performed between that event and the next event triggering a payment obligation (or if none, the Services are completed.)

Notwithstanding the foregoing, section 6 of this Agreement ("Confidential Information") and section 7 of the Agreement ("Intellectual Property Rights") will survive the expiration or early termination of this Agreement. Contractor further agrees that for a period of six months following expiration or termination of this Agreement, Contractor will not hire solicit or encourage any employee, consultant or contractor of Company to terminate their relationship with Company.

1 _D.B_

**9. INDEMNIFICATION**

Contractor will indemnify and hold Company and its officers, directors, employees, agents harmless against all claims, losses, expenses (including reasonable attorney fees, witness fees, and costs) and injuries to any person or property that result from or arise out of: (1) negligence of Contractor in the performance or failure to perform the Services; (2) any breach by Contractor of any provision of this Agreement, including any representation or warranty; or (3) any violation by Contractor of any law or regulation.

**10. INSURANCE**

Contractor will, at Contractor's sole expense, obtain insurance covering such risks and with such coverage limits as are reasonable and customary in view of the Services to be rendered and the risks associated with the Services, including, if appropriate, malpractice insurance and general liability insurance, workman's compensation insurance.

Company reserves the right to require that Contractor obtain additional insurance coverage if it reasonable appears to Company that Contractor's coverage is inadequate to cover the risks associated with the Services. Company also reserves the right to require that Company be named as additional insured on Contractor's liability insurance policy.

**11. UNENFORCEABILITY OF PROVISIONS**

If any provision of this Agreement is held to be invalid or unenforceable or to cause any other portion of this Agreement to become invalid or unenforceable, then that provision will be deemed to be limited, modified or stricken to the extent necessary to effectuate, as nearly as possible, the original intent of the parties as expressed in this Agreement, and the remainder of this Agreement will continue in full force and effect.

**12. NOTICES**

Any notice given under this Agreement must be in writing and will be deemed to have been given upon delivery if delivered personally or by courier; upon receipt if transmitted by email, facsimile or other electronic means with acknowledgment of receipt; three working days after it is deposited, prepaid, in the regular mail for domestic delivery; and five working days after it is deposited, prepaid, in the regular mail for international delivery; provided, in each instance, that the notice is addressed to the recipient as indicated below, as that information may be updated by written notice to the other party.

**13. SUCCESSORS; ASSIGNMENT**

This agreement will be binding on and inure to the benefit of the parties and their respective successors, assigns and heirs, if any. Notwithstanding the foregoing, Contractor may not assign any rights or duties under this Agreement without the prior written consent of Company.

**14. SOLE AGREEMENT; COUNTERPARTS; MODIFICATIONS; WAVIERS**

This Agreement contains the entire understanding of parties relating to its subject matter and supersedes any prior agreement or understanding, however expressed. This Agreement may be executed in counterparts, each of which will be an original, but all of which together will constitute one and the same Agreement. This Agreement may not be amended except in a writing signed by both parties. Any waiver by one party of a breach of this Agreement will not be construed as a continuing waiver.

## 7. INTELLECTUAL PROPERTY RIGHTS

Company will be the sole and exclusive owner of any and all inventions, discoveries, developments, designs, innovations, information and works of authorship that are conceived by the Contractor during the term of this Agreement and that (1) relate to Company's business or its anticipated research or development, (2) are developed using Company's equipment, supplies, facilities, trade secrets, or time, or (3) result from Contractor's performance of the Services (collectively, the "Intellectual Products."

Contractor assigns all of Contractor's right, title and interest in the Intellectual Products to Company. Contractor will execute all papers, including patent applications, invention assignments, and copyright assignments, and will otherwise assist Company (at Company's expense) to perfect its rights to the Intellectual Products. Contractor irrevocably appoints Company as Contractor's attorney-in-fact with authority to execute, on behalf of Contractor, all papers necessary to perfect Company's rights in the Intellectual Products.

Contractor grants to Company a non-exclusive, perpetual, world-wide, royalty-free, irrevocable license to use any intellectual property that Contractor uses in rendering the Services or that Contractor incorporates into any work produced in rendering the Services, including but not limited to any inventions, discoveries, innovations or works of authorship that were conceived and owned by Contractor prior the term of this Agreement. Company may assign this license to any subsidiary or other affiliated entity but will not market Contractor's intellectual property separate from Company's products.

Any Intellectual Product which is copyrightable subject matter, shall be considered "works made for hire" as that term is defined in the United States Copyright Act with Company as the sole author and owner. Contractor further irrevocably transfers and assigns to Company without reservation all right, title and interest in the Intellectual Product throughout the universe in perpetuity in all media, whether now known or later devised, and in all copyrights, patents, mask work rights, trade secrets, database rights or other intellectual property rights, however denominated. Contractor waives any so-called "moral rights" in the Intellectual Product and agrees to waive and not assert any so-called "moral-rights" against Company.

## 8. THIRD PART RIGHTS

Contractor represents and warrants that Contractor is not under any existing obligation in conflict with this Agreement and has not granted any rights or licenses to any intellectual property or technology that would conflict with Company's rights or Contractor's obligations under this Agreement, Contractor warrants that Contractor has the right to disclose or use all ideas, processes, techniques, intellectual properties and other information, if any, that Contractor will disclose to Company or use in the performance of the Services, without liability to any third party.

Contractor will not knowingly infringe upon any copyright, patent, trade secret or other property right of any third party in the performance of the Services and will not disclose or otherwise make available to Company in any manner any confidential information received by Contractor from third parties if doing so would violate Contractor's obligations to the third parties.

3

**EXHIBIT A**

**SERVICES**
Can include the following per contractor skills: Repair and installation of household appliances, HVAC and plumbing service calls.

**TERMINATION DATE**
This Agreement will expire on ___2/18/2022___ unless terminated earlier as provided in the Agreement.

**COMPENSATION**
Payment will be made according to the attached flat rate fee schedule on all collectible labor for services provided.  Payment becomes available to Contractor when Company is paid for completed job. Payment will be made weekly during the appropriate payment period. Payment for parts which reimbursement is uncollectible will be taken out of contractor settlement. Restocking or return fees for return parts ordered at the request of contractor will be taken out of contractor settlement. Contractor will not be paid for jobs that are uncollectible. No unscheduled labor is to be performed on company jobs without prior consent of management and any and all additional labor is to be billed and collected through Company.

Any jobs requiring authorization must be called in and proper authorization obtained prior to close of business on the day of the visit. Any jobs not called in with proper proof of authorization will be assessed a $5.00 per job penalty.

Stock parts will be made available for contractor at contractor request. Stock parts will be charged to contractor, charges for initial stock will be taken out of settlement during the first 4 settlements after receiving stock parts.

Upon termination of contract, any collectable labor for services provided will become due and payable to contractor 90 days from the date the contract is terminated. This allows for any recalls and open tickets to be completed prior to final settlement being made.

**INITIALS**
Company:

Contractor:

6

## 15. ARBITRATION

Any dispute or claim arising out of this Agreement excluding section 6 ("Confidential Information") and section 7 ("Intellectual Property Rights") will be resolved by binding arbitration by a single arbitrator in Utah in accordance with the rules of the American Arbitration Association. Judgement on the award rendered by the arbitrator may be entered in any court with jurisdiction. Either party may apply to any court with jurisdiction for preliminary or interim relief or to compel arbitration. The parties waive their right to a court or jury trial with respect to any disputes, covered by this provision and agree that the arbitrator's award will be final and may not be appealed.

## SIGNATURES

The parties have executed this Agreement on the respective dates indicated below.

**Company:**

Signature: _____

Print Name: Roger Hughes

Title: Service Manager

Address: 854 W 450 N, Suite # 10, Kaysville, UT 84037

Contact Number: 801-436-3333

Date: 2/10/2020

**Contractor:**

Signature: _____

Print Name: David Baker

Company Name: Baker's Appliance Repair

Address: 7255 Adams Rd    City: Magna    State: UT    Zip Code: 84044

Date: 2-12-2020

Tax ID Number (EIN) 82-0953190

Contractor Mobile/Cell Number: _____

Emergency Contact Information: Name: 831-210-2699    Phone: _____

Toisha Baker

5____

**FLAT RATE FEE SCHEDULE**

**Plumbing Replacements**

| | |
|---|---|
| Water Heaters | $201.00 |
| Toilets | $62.00 |
| Water softeners | $75.00 |
| Descaler/Filter | $150.00 |
| Faucets | $45.00 |
| Sinks | $75.00 |
| Garbage Disposals | $42.00 |

**Plumbing Repairs**
$55.00 per billable hour

**HVAC Replacements/Repairs**
$55.00 per billable hour
Pre-Season Tune-Up   $25.00

**Appliance Repairs**

| | |
|---|---|
| Minor Repair | $42.00 (Split jobs: $12.60 & $29.40) |
| Major Repair | $75.00 (Split jobs: $22.50 & $52.50) |
| Store Stock Minor | $35.00 (Split jobs: $10.50 & $24.50) |
| Store Stock Major | $60.00 (Split jobs: $18.00 & $42.00) |
| Dryer Cleaning (upsell) | $30.00 |
| Refrigerator Coil Cleaning | $30.00 |

**Appliance Install**

| | |
|---|---|
| Minor | $60.00 |
| Major | $85.00 |
| Detail | $21.00 |

**Whole Home Duct Cleaning**

| | |
|---|---|
| First System | $165.00 |
| Additional Systems | $150.00 |

**Dryer Duct Cleaning**

| | |
|---|---|
| First Dryer | $55.00 |
| Additional Dryers | $55.00 |

*Any additional labor and/or modifications on top of any of these flat rates must be approved by management prior to work being performed.

7_____